UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

                Plaintiff,              Criminal Case No.  17-20697

    v.

                                  Hon. Arthur J. Tarnow

ANTHONY LEDELL JONES,

                Defendant.

_____/

## MOTION FOR COMPASSIONATE RELEASE

The COVID-19 pandemic is devastating the Bureau of Prisons. In short order, more than 11,757 incarcerated people and more than 1,497 staff members have contracted the virus.[1] 116 incarcerated people and one staff member have died.[2] The spread of the virus is not under control.

Anthony Jones is particularly vulnerable to suffering complications from a COVID-19 infection as a 49-year-old obese Black man who struggles with hypertension, prediabetes, and an amputated leg. He respectfully moves pursuant to 18 U.S.C. § 3582(c)(1)(A)(i): (1) for a compassionate release order reducing his sentence to time served because his medical conditions render him particularly susceptible to

---

[1] BOP, *COVID-19 Cases*, https://www.bop.gov/coronavirus/ (last accessed Aug. 24, 2020).
[2] *Id.*

complications from COVID-19; (2) that the remaining period of his 70-month sentence be converted to home confinement as a condition of supervised release; and (3) that he be allowed to quarantine at home for the recommended fourteen days instead of remaining at the BOP facility. In the alternative, he asks for a judicial recommendation for home confinement under 18 U.S.C. § 3624(c)(2), as extended by the CARES Act § 12003(b)(2).

## BACKGROUND

Law enforcement officers arrested Anthony Jones after seeing a handgun on him while searching for his dog on his bicycle. Jones admitted he possessed a firearm, and he was arrested without incident. At the time of the arrest, he stated he only carried the firearm because "it's dangerous out there." There were never any allegations that Mr. Jones acted violently at any time during the period he was under investigation. (PSR ¶¶ 12–13)

In July 2018, Anthony Jones accepted responsibility for possessing a stolen firearm. (R. 35, Plea Agreement, PgID 88–106) In November 2018, this Court sentenced him below the Guidelines, to the lowest sentence allowed under the plea agreement: a 70-month term of imprisonment to be followed by three years of supervised release. (R. 39, Judgment, PgID 130; PSR ¶ 62) He is scheduled for release May 19, 2022. (Ex. A, Public Info)

## LEGAL STANDARD

Under the First Step Act of 2018 (1SA), this Court can and should reduce

2

Mr. Jones's sentence. Compassionate release is appropriate when: (1) "extraordinary and compelling reasons warrant" reduction; and (2) the reduction is consistent with Sentencing Commission "policy statements" found in U.S.S.G. § 1B1.13. *See* 18 U.S.C. § 3582(c)(1)(A). The Commission set forth three categories qualifying as extraordinary and compelling: terminal medical conditions, medical debilitation, and family circumstances. U.S.S.G. § 1B.13 cmt.1(A)–(C). Recognizing these categories might not encompass all compelling reasons, the Commission added "other reasons"—which may act "in combination" with the other categories or be wholly independent. *See* U.S.S.G. § 1B1.13 cmt.1(D).

But these policy statements were last revised before the 1SA, and so "[t]here is no policy statement applicable to motions for compassionate release filed by defendants under the [1SA]."[3] The 1SA broadened courts' discretion to use Application Note 1(D) of U.S.S.G. § 1B1.13 to decide what "extraordinary and compelling circumstances" are[4] and if compelling reasons other than age, medical conditions, or family circumstances exist.[5]

---

[3] *United States v. Beck*, __ F. Supp. 3d __, 2019 WL 2716505, at *6 (M.D.N.C. June 28, 2019); *see also United States v. Mondaca*, 2020 WL 1029024, at *3 (S.D. Cal. Mar. 3, 2020) ("[T]he Commission never harmonized its policy statement with the [1SA]."); *United States v. Gagne*, 2020 WL 1640152, *2 (D. Conn. Apr. 2, 2020), appeal pending, No. 20-1169 (2d Cir.).

[4] *United States v. Lisi*, 2020 WL 881994, at *3 (S.D.N.Y. Feb. 24, 2020); *accord United States v. Redd*, 2020 WL 1248493, *6 (E.D. Va. Mar. 16, 2020); *United States v. Bradshaw*, 2019 WL 7605447, *3 (M.D.N.C. Sept. 12, 2019).

[5] *See, e.g.*, *United States v. Redd*, No. 1:97-cr-0006-AJT, 2020 WL 1248493, at *8 (E.D. Va. Mar. 16, 2020) ("[A] court may find . . . that extraordinary and compelling reasons exist

3

## ARGUMENT

COVID-19 is ravaging the BOP. People in federal custody cannot take appropriate hygienic and social-distancing measures to protect themselves from infection. These are extraordinary times. And Mr. Jones's health conditions make him particularly vulnerable. This Court can and should convert his remaining time in custody to home confinement.

## I. Exhaustion Is Not an Obstacle

An incarcerated person in BOP custody may file a motion once he "has fully exhausted all administrative rights to appeal a failure of the [BOP] to bring a motion on the defendant's behalf *or* the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, *whichever is earlier*." 18 U.S.C. of § 3582(c)(1)(A) (emphasis added).

On July 24, 2020, Mr. Jones requested compassionate release through counsel, citing his hypertension, obesity, pre-diabetes, amputation, sciatica, and the risk the novel coronavirus poses to people with his medical conditions. (Ex. B, Request for Comp. Release) Because Mr. Jones tried to avail himself of administrative remedies and more than 30 days have lapsed since his request for compassionate release, this Court has the power to consider and grant his motion.

---

based on facts and circumstances other than those set forth in U.S.S.G. § 1B1.13 cmt. n.1(A)-(C) . . . ."); *United States v. Perez*, No. 88-10094-JTM, 2020 WL 1180719, at *2 (D. Kan. Mar. 11, 2020) (same); *United States v. Maumau*, No. 2:08-cr-0758-TC, 2020 WL 806121, at *3 (D. Utah Feb. 18, 2020) (same).

## II.   The COVID-19 Pandemic and Mr. Jones's Health Conditions Are Extraordinary and Compelling Reasons to Grant Compassionate Release

Mr. Jones's high blood pressure, body mass index (BMI), prediabetes, amputation, race, and age put him at increased risk of severe complications from COVID-19, up to and including death. These conditions and his continued incarceration during this pandemic "substantially diminish[] the ability of [Mr. Jones] to provide self-care within the environment of a correctional facility." U.S.S.G. § 1B1.13, cmt. n.1(A)(ii).[6] These circumstances are also "extraordinary and compelling." *See* U.S.S.G. § 1B1.13 cmt.1(D).

### A.   COVID-19 and Mr. Jones's health and demographics put him at risk

The COVID-19 pandemic is an unprecedented health crisis. As this court knows, COVID-19's death rate goes up the older you are and the sicker you are. Mr. Jones falls within this category of inmates based on his health conditions and demographic profile.

***Hypertension.*** Mr. Jones suffers from hypertension, which is categorized as a

---

[6] *United States v. Atkinson*, 2020 WL 1904585, at *3 (D. Nev. Apr. 17, 2020) ("The presence of COVID-19 . . . necessitates a more expansive interpretation of what self-care means"); *United States v. Rahim*, No. 16-20433, 2020 WL 2604857, at *2 (E.D. Mich. May 21, 2020) (Edmunds, J.); *United States v. Hunt*, No. 18-20037, 2020 WL 2395222 (E.D. Mich. May 12, 2020) (Hood, C.J.); *United States v. Reddy*, No. 13-CR-20358, 2020 WL 2320093 (E.D. Mich. May 11, 2020) (Leitman, J.); *United States v. Amarrah*, No. 17-20464, 2020 WL 2220008, at *6 (E.D. Mich. May 7, 2020) (Levy, J.).

regular blood pressure above 120/80.[7] While his most recent blood pressure reading was 110/80, prior to that date, Mr. Jones consistently had elevated blood pressure, with a reading of 138/94 in May 2020 and 122/84 in December 2019. (Sealed Ex. D, 2020 Medical Records at 1, 6; *see also* PSR ¶ 51) To manage his high blood pressure, Mr. Jones is prescribed amLODIPine (10 mg) and Lisinopil (10 mg). (*Id.*, at 40)

Mr. Jones's hypertension renders him more susceptible to COVID-19. Though the CDC currently classifies hypertension as a condition that might increase the risk of severe illness from COVID-19,[8] "[t]he scientific community knows with relative certainty is that hypertension is one of the most common 'comorbidities' in people who experience severe cases of COVID-19, a fact that has been apparent since the early days of the pandemic; indeed, much research identifies hypertension as the *most* common comorbidity."[9] Based on this research, "[c]ourts in this district have found that there is sufficient scientific evidence of a comorbidity between hypertension and COVID-19 to

---

[7] Nancy A. Anoruo, M.D., M.P.H., *Having high blood pressure may make coronavirus more dangerous*, ABC News (Jun. 1, 2020), https://abcnews.go.com/US/high-blood-pressure-make-coronavirus-dangerous/story?id=70991996.

[8] CDC, *People with Certain Medical Conditions*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html, (last accessed August 11, 2020).

[9] *United States v. Salvagno*, No. 5:02-cr-0051, Dkt. #1181 at 14 (citing, *inter alia*, *Hospitalization Rates and Characteristics of Patients Hospitalized with Laboratory-Confirmed Coronavirus Disease* 2019, CDC, https://www.cdc.gov/mmwr/volumes/69/wr/mm6915e3.htm; *Interim Clinical Guidance for Management of Patients with Confirmed Coronavirus Disease*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/hcp/clinical-guidance-management-patients.html).

justify release from custody."[10]

**_Body Mass Index._** A BMI that is above 29.9 moves an individual from a category of overweight to obese. Mr. Jones is 5'5" and currently 180 lbs., making his BMI 30, so he is considered obese. (Sealed Ex. D, 2020 Medical Records at 7; *see also* PSR ¶ 49)

The CDC has labeled obesity as a risk factor with the "strongest and most consistent evidence" for an association with severe illness from COVID-19.[11] And the increased susceptibility applies to people *of any age*, even those who are under 60.[12] For these reasons, prosecutors in this district have conceded,[13] and this Court has found, that a BMI of more than 30 satisfies the "extraordinary and compelling" circumstances standard under § 1B1.13(1)(A).[14]

---

[10] *United States v. McConico*, No. 15-20267, 2020 WL 4431424, at *2 (E.D. Mich. July 31, 2020) (citing *United States v. Sanders*, No. 19-cr-20288, ECF No. 35, PgId.202–203 (E.D. Mich. Apr. 17, 2020) (collecting cases)).

[11] CDC, *Medical Conditions Evidence Table*, available at https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/evidence-table.html (last accessed August 11, 2020).

[12] *See* Jennifer Lighter, et al., *Obesity in Patients Younger Than 60 Years Is a Risk Factor for COVID-19 Hospital Admission*, CLINICAL INFECTIOUS DISEASES (2020), available at https://academic.oup.com/cid/article/doi/10.1093/cid/ciaa415/5818333.

[13] *See United States v. Ireland*, Cr. No. 17-20203, Dkt. 35-1, AUSA Email, PgID 200 (E.D. Mich. July 17, 2020) (agreeing defendant's BMI of 30.6 "satisfies the 'extraordinary and compelling' standard under 1B1.13(1)(A)"); *United States v. Pacely*, Cr. No. 18-20283, Dkt. 28, Resp., PgID 145 (E.D. Mich. July 8, 2020) (acknowledging obesity and diabetes qualified as extraordinary and compelling reasons, even in a facility with no confirmed COVID-19 cases).

[14] *See Crider v. United States*, No. 01-81028-1, 2020 WL 4334967, at *3 (E.D. Mich. July 28, 2020); *Cotton v. United States*, No. 16-20222-8, 2020 WL 3488752, at *3 (E.D. Mich. June 26, 2020)

***Amputation.*** Mr. Jones had his right leg amputated from a gunshot wound in 2010 and requires the use of a prosthetic to move. (PSR ¶ 50; *see also* Sealed Ex. E, 2019 Medical Records at 36) He has been prescribed DULoxetine for phantom nerve pain from the amputation. (Ex. Sealed D, 2020 Medical Records at 40) He also reports regular skin irritations from his prosthetic and has been prescribed topical steroids. (Sealed Ex. D, 2020 Medical Records at 5; Sealed Ex. E, 2019 Medical Records at 31)

Amputation makes it harder for individuals to provide self-care during the COVID-19 health crisis. One court, which originally denied compassionate release to an amputee prior to the pandemic, recently granted release because the "inability to ambulate poses grave consequences when an inability to move means forced interactions with staff and greater difficulty to adhere to social distancing guidelines in prison."[15]

***Prediabetes.*** Mr. Jones has been counseled about prediabetes. (Sealed Ex. D, 2020 Medical Records at 9) Diabetes is monitored with "A1c" readings, measuring blood sugar levels, and a score over 6.7% equates to diabetes.[16] In May 2020, Mr. Jones had an A1c of 5.7%, which puts him at an increased risk for diabetes. (Sealed Ex. D,

---

[15] *United States v. Mattingley*, No. 15-CR-0005, 2020 WL 2499707, at *3 (W.D. Va. May 14, 2020) (releasing an amputee with phantom nerve pain, hypertension and diabetes); *United States v. York*, No. 11-CR-76, 2019 WL 3241166 (E.D. Tn. July 18, 2019) (releasing an amputee with congestive heart failure before COVID-19).

[16] *See* Mayo Clinic, *A1C Test Description*, available at https://www.mayoclinic.org/tests-procedures/a1c-test/about/pac-20384643.

2020 Medical Record at 43) Prediabetes is diagnosed when a person's blood sugar levels are elevated, but not high enough to qualify as diabetes. The CDC recognizes diabetes as creating a serious risk of illness from COVID-19, and this Court has thus recognized that a person approaching status as a diabetic also are at increased risk.[17]

**Age.** Mr. Jones is 49-years-old, which puts him at greater risk for contracting COVID-19. The CDC has made clear "the risk for severe illness from COVID-19 increases with age."[18] Expert review of CDC-published COVID-19 data in the U.S. reveals that "hospitalization rates and intensive care unit (ICU) rates were nearly identical for individuals aged 45-54 and individuals aged 55-64 (between approximately 20-30% for both groups for hospitalization and between 5-11% for both groups for ICU admission)." (Ex. F, Amon Decl. ¶ 9) The data "suggests that individuals >45 years could be considered high risk for severe disease while those ≥54 years could be considered high risk for severe disease and death." (*Id.*) Standing alone, Jones's age, therefore, makes him at least high risk for severe disease, and potentially at high risk for severe disease and death, as discussed below.

---

[17] *See Cotton*, 2020 WL 3488752, at *3 (granting release to a person with prediabetes); *United States v. Readus*, No. 16-20827-1, 2020 WL 2572280, at *3 (E.D. Mich. May 21, 2020) (finding a combination of prediabetes and obesity sufficient to warrant release) (collecting cases).

[18] CDC, *People at Increased Risk for Severe Illness*, available at https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html.

Even though Mr. Jones is not yet 50, medical experts have stated the prison population should be looked at differently from the general public because "prisoners' physiological age averages 10-15 years older than their chronological age." (Ex. G, Williams Decl. ¶ 12) Mr. Jones has been incarcerated for three years for this offense and for over six years before that. (Ex. A, Pub. Info. at 3) *See also* PSR ¶¶ 32, 35-36. Given the time Mr. Jones has spent in prison, he is likely physiologically a decade (or more) older than he is on paper, making him even more vulnerable to COVID-19. As another doctor explained, "[t]he case fatality rate varies significantly with advancing age, rising after age 50, and is above 5% (1 in 20 cases) for those with pre-existing medical conditions," such as hypertension or obesity. (Ex. H, Goldenson Decl. ¶ 8)

\* \* \*

Each of Mr. Jones's most serious health conditions render him particularly vulnerable to complications of a COVID-19 infection. Even if these individual conditions on their own do not create extraordinary and compelling reasons to release Mr. Jones to home confinement, "all of his conditions compounded still place [him] in a much more vulnerable position than a healthy person, if he were to get COVID-19."[19]

---

[19] *Loyd v. United States*, No. CR 15-20394-1, 2020 WL 2572275, at *3 (E.D. Mich. May 21, 2020); *see also McConico*, 2020 WL 4431424, at *2 (finding obesity, hypertension, and diabetes "sufficiently dangerous preexisting conditions to constitute extraordinary and compelling reasons to release younger men than" 41-year-old inmate); *Readus*, 2020 WL 2572280, at *2-3 (releasing 33-year-old man with obesity, hypertension, prediabetes, and sleep apnea).

**B.   COVID-19 poses acute risks to people in custody**

Mr. Jones is also at increased risk due to his incarceration. Epidemiologists know that detention facilities are "associated with high transmission probabilities for infectious diseases." (Ex. C, Beyrer Dec. ¶ 11)[20] Recognizing this risk, this Court has found "[t]he heightened susceptibility of prison populations to the [COVID-19] virus is an additional reason . . . for the release of medically vulnerable inmates."[21]

The numbers of positive-COVID-19 cases in BOP continue to increase exponentially. And there is considerable evidence that the numbers publicly reported by the BOP undercount the number of incarcerated people actually infected. BOP facilities that implemented testing saw dramatic increases in the number of cases.[22] Even by the BOP's count, COVID-19 is infecting incarcerating individuals at a rate 5.95 times higher than the general population:[23]

---

[20] *See* Joseph A. Bick, *Infection Control in Jails and Prisons*, Clinical Infectious Diseases 45(8):1047-1055 (2007), *at* https://doi.org/10.1086/521910.

[21] *United States v. Watkins*, No. 15-20333, 2020 WL 4016097, at *2 (E.D. Mich. July 16, 2020) (citing *Miller v. United States*, No. 16-20222-1, 2020 WL 1814084, at *3 (E.D. Mich. Apr. 9, 2020).

[22] *See, e.g.*, Walter Pavlo, *After Seeing Federal Bureau of Prisons Up Close, Federal Judges May See Sentencing Differently in Future*, Forbes (May 3, 2020), shorturl.at/dtN89; Luke Barr, *70% of inmates tested have COVID-19: Bureau of Prisons*, ABC News (May 1, 2020), shorturl.at/ayLRZ.

[23] Charts available at https://federaldefendersny.org/ (last visited Aug. 24, 2020).

**COVID-19 Rate of Infection for Various Populations**

| Location | Cases | Population | Infections/ 1,000 People | Infection Rate as Percent of Population |
|---|---|---|---|---|
| BOP Imprisoned Population | 11,792[24] | 141,755[25] | 83.19 | 8.3186% |
| United States | 5,600,107 | 330,159,704[26] | 16.96 | 1.6962% |
| China | 89,594[27] | 1,394,015,977[28] | 0.06 | 0.0064% |
| Italy | 257,065[29] | 62,402,659[30] | 4.12 | 0.4119% |

The high rate of infection in federal prisons shows how the BOP fails to follow its own policies consistently. Staff who should be quarantined after exposure aren't.[31]

---

[24] Includes the number of BOP inmates who have tested positive for COVID-19, the number of BOP inmates who have recovered, and the number of BOP inmates who have died from COVID-19. Numbers obtained from www.bop.gov/coronavirus on a daily basis. There is good reason to believe that the numbers reported by the BOP understate the actual number of tested-positive cases. *Compare* M. Licon-Vitale, MCC Ward, and D. Edge, MDC Warden, *Response to EDNY Administrative Order 2020-14* (Apr. 7, 2020) *at* https://www.nyed.uscourts.gov/pub/bop/MDC_20200407_042057.pdf (3 positive inmates at MDC Brooklyn) *with COVID-19 Cases* Federal Bureau of Prisons (Apr. 7, 2020) *at* www.bop.gov/coronavirus (2 positive inmates at MDC Brooklyn).

[25] Includes the number of federal inmates in BOP-managed institutions, the number of federal inmates in community-based facilities, and the number of federal inmates who have died from COVID-19. Numbers obtained from www.bop.gov/coronavirus on a daily basis.

[26] Numbers obtained on 8/21/2020 at 3:26pm from https://coronavirus.jhu.edu/map.html

[27] *Id.*

[28] Numbers obtained on 8/21/2020 at 3:27pm from https://www.census.gov/popclock/

[29] Numbers obtained on 8/21/2020 at 3:26pm from https://coronavirus.jhu.edu/map.html

[30] Numbers obtained on 8/21/2020 at 3:27pm from https://www.census.gov/popclock/

[31] Joseph Neff & Keri Blakinger, *Federal Prisons Agency "Put Staff in Harm's Way" of Coronavirus*, The Marshall Project (Apr. 3, 2020), available at: https://bit.ly/2VkWuTC.

Prisons fail to stock basic essentials like soap.[32] The situation is so poor that a union representing 30,000 BOP employees has filed an OSHA complaint because "staff who were screened and ordered home" based on the screening tool shown above were "ordered back to work within 48 hours."[33]

Mr. Jones is not in a prison immune from a COVID-19 outbreak. Schuylkill FCI, where Mr. Jones is currently incarcerated, has reported one "recovered" case of COVID-19 and additional tests are pending.[34] Schuylkill houses 1,029 incarcerated people, yet as of August 24, the BOP reports the following test results:[35]

| No. of Inmates with Completed Tests | No. of Inmates with Pending Tests | No. of Inmates with Positive Tests |
|:---:|:---:|:---:|
| 158 | 6 | 1 |

Despite the positive test and the ease with which the virus spreads, testing at Schuylkill is not universal. This is troubling given the explosion of COVID-19 cases in

---

[32] *See* Letter from Jerrold Nadler, Chair, House Judiciary Comm., to William Barr, Att. Gen., at 1 (Apr. 10, 2020) ("Reports from inside the Oakdale facility indicate that there is a continuing lack of availability of personal hygiene products and that general sanitation is lacking.") (citing Sadie Gurman et al., *Coronavirus Puts Prison Under Siege*, Wall Street Journal (Apr. 6, 2020), available at https://on.wsj.com/3a4TD6K.

[33] *See* OSHA Complaint, https://www.afge.org/globalassets/documents/ generalreports/coronavirus/4/osha-7-form-national-complaint.pdf. The situation has worsened since the plaintiffs filed this complaint. Inmate movement across BOP and local detention centers—one of the central OSHA complaints—continues.

[34] BOP, *COVID-19 Inmate Test Information*, https://www.bop.gov/coronavirus/ (last accessed August 13, 2020).

[35] *Id.*; *FCI Schuylkill*, BOP, available at https://www.bop.gov/locations/institutions/sch/ (last accessed August 24, 2020).

certain BOP facilities. This Court has not hesitated to grant compassionate release to persons held in facilities with *zero* confirmed cases because "[t]he prison's report of zero confirmed cases is more likely a result of a lack of testing than a lack of the virus' presence in the prison."[36]

Courts have found extraordinary and compelling circumstances exist at FCI Schuylkill.[37] Further, as of August 24, 2020, Schuylkill County, where FCI Schuylkill is located, has 938 active cases of COVID-19 and 51 deaths.[38] "[A]bsent zero cases in [Schuylkill] County the prison is still at risk of exposing inmates" because "[p]resumably, many of FCI [Schuylkill]'s staff live in [Schuylkill] County and may have been exposed to COVID-19."[39]

## III.  The Sentencing Factors in 18 U.S.C. § 3553(a) favor Mr. Jones's release.

In totality, the § 3553(a) factors favor Mr. Jones's release. He understands the seriousness of his offense and has been sufficiently deterred by his greater than three

---

[36] *Street v. United States*, No. 15-20624, 2020 WL 4284313, at *1 (E.D. Mich. July 27, 2020).

[37] *See, e.g.*, *United States v. Croft*, No. 95-496-1, 2020 WL 3871313, at *2 (E.D. Pa. July 9, 2020); *United States v. Davis*, No. 10-Cr-99, 2020 WL 3843682 (D. Conn. July 8, 2020); *United States v. Galloway*, No. RDB-10-0775, 2020 WL 2571172 (D. Md. May 21, 2020); *United States v. Rountree*, No. 12-CR-0308, 2020 WL 2610923, at *7-8 (N.D.N.Y. May 18, 2020); *United States v. Peters*, No. 18-CR-188, 2020 WL 2092617 (D. Conn. May 1, 2020); *United States v. Gileno*, No. 19-CR-161-VAB, 2020 WL 1916773 (D. Conn. April 20, 2020).

[38] *See* COVID-19, Pa. Health Dep't, Schuylkill Cnty., available at https://www.health.pa.gov/topics/disease/coronavirus/Pages/Cases.aspx (last accessed Aug. 24, 2020).

[39] *United States v. Pomante*, No. 19-20316, 2020 WL 2513095, at *4 (E.D. Mich. May 15, 2020).

14

years in custody. Moreover, the circumstances created by the COVID-19 pandemic justify release even though Mr. Jones's sentence was just at the time of its imposition. "When the Court sentenced [Mr. Jones], the Court did not intend for that sentence to 'include incurring a great and unforeseen risk of severe illness or death' brought on by a global pandemic.'"[40]

***Retribution & Deterrence.*** The conditions of incarceration are inherently intertwined with the question of what punishment is just. Mr. Jones has spent 38 months in prison—more than half his sentence and over 63% of the statutory minimum sentence. (Ex. A, Pub. Info.) In addition, he will spend whatever time left there is to serve in harsher-than normal conditions. Since March 13, 2020, BOP "modified its operations" to respond to the spread of COVID-19.[41] Under this plan, people "in every institution" are "secured in their assigned cells/quarters to decrease the spread of the

---

[40] *Ireland*, 2020 WL 4050245, at *6 (quoting *Hunt*, 2020 WL 2395222, at *6 (E.D. Mich. May 12, 2020)).

[41] Fed. Bureau of Prisons, *Fed. Bureau of Prisons COVID-19 Action Plan* (Mar. 13, 2020), https://www.bop.gov/resources/news/20200313_covid-19.jsp (Phase II). Phase II's modified operations were extended as described in Phase III, Phase IV, Phase V, Phase VI, and Phase VII.

virus."[42] Family and friends are prohibited from visiting.[43] Programming, absent select UNICOR operations, has ceased and movement throughout the facility is suspended.[44] And while BOP's website claims people are permitted to move for showers three times a week, telephone and email access, commissary, and laundry,[45] in reality, even these basic activities are often not allowed. Conditions amount to a "total lockdown" nearly all day long.[46]

These conditions have made Mr. Jones's months in prison even more punitive. Reducing his sentence does not "threaten to diminish respect for the law. Respect for

---

[42] Institution lockdown began on April 1, 2020 (Phase V) and was subsequently extended through May 18, 2020, (Phase VI) and again through June 30, 2020 (Phase VII). At some facilities, once someone tests positive for the virus, they are put in solitary confinement. *See, e.g.*, Complaint, *Torres v. Milusnic*, No. 20-cv-04450 (C.D. Cal. May 16, 2020), ECF No. 1, at 55 (Perales Decl.) (petitioner placed in Special Housing Unit (SHU) after testing positive for COVID-19); Class Action Petition for Writ of Habeas Corpus, *Hallinan v. Scarantino*, No. 20-hc2088-FL (E.D.N.C. May 26, 2020), ECF No. 1-4, at 6 (Goodwin Decl.) (Petitioner in FCI Butner Medium I moved to the SHU after testing positive for COVID-19).

[43] Fed. Bureau of Prisons, *BOP Implementing Modified Operations*, https://www.bop.gov/coronavirus/covid19_status.jsp (last visited August 13, 2020).

[44] *Id.*

[45] *Id.*

[46] Letter from Dr. Sandro Galea, Dean, Boston Univ. School of Pub. Health, et al., to President Trump 1 (Mar. 27, 2020), https://thejusticecollaborative.com/wp-content/uploads/2020/03/Public-Health-Expert-Letter-to-Trump.pdf (co-signed by numerous public health officials from leading medical and public health institutions); see also Ctrs. for Disease Control and Prevention, *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities*, https://bit.ly/2M9IF6a (last visited August 13, 2020) (recognizing that correctional and detention facilities present "unique challenges for control of SARS-CoV-2 transmission," due to the fact that individuals "live, work, eat, study, and recreate within congregate environments").

the law is promoted by demonstrating its humanity as much as its rigidity."[47]

**Incapacitation.** Predicting recidivism is nearly impossible. But a number of factors suggest Mr. Jones is not a danger to the community. Mr. Jones is 49 years old. "It is commonly known that recidivism reduces with age"[48] and "decline[s] substantially" around age 50.[49] Data from the U.S. Sentencing Commission USSC supports this conclusion.[50] Moreover, his status as an amputee makes it difficult for him to move around. He has nerve pain and wounds from his prosthetic that have gotten worse while incarcerated. (*See* Sealed Ex. D, 2020 Medical Records at 40; Sealed Ex. E, 2019 Medical Records at 31) Given these difficulties in providing basic self-care, it seems unlikely he would pose a danger to the community.

Mr. Jones's conduct in prison supports the conclusion that he is not a danger. He has only had three minor incidents, all nonviolent. One involved a citation for being insolent to a staff member, in April 2018, before his sentencing, when he was in pretrial custody at FCI Milan. (*See* Ex. I, Discipline) In March 2019, he was cited for refusing work, but this was likely a mistake, as the report states "he did not check the call outs for that day." (*Id.*) The most recent incident involved refusing to obey an order, but the report noted "[h]e displayed a good attitude," and clearly did not show disdain for

---

[47] *McConico*, 2020 WL 4431424, at *4.

[48] *United States v. Rainone*, No. 09-CR-206, 2020 WL 3468307, at *1 (N.D. Ill. June 19, 2020).

[49] *See United States v. Williams*, No. 06-CR-0143, 2020 WL 3097615, at *1 (D. Minn. June 11, 2020).

[50] *See* USSC, *The Effects of Aging on Recidivism Among Federal Offenders*.

authority. (*Id.*)

While Mr. Jones cannot escape the fact of his prior convictions, his criminal history should not prevent his release. He acknowledges that his crime was serious, but his offense conduct was non-violent. Moreover, the majority of his prior convictions involve non-violent drug offenses. (*See* PSR ¶¶ 30–33, 36) Although Mr. Jones was classified as an armed career criminal at sentencing, when the Government weighed his physical and intellectual disabilities against his criminal history, it recommended a sentence below the statutory minimum and the guidelines range, and the court followed suit. (R. 38, Gov. Sent. Mem., PgID 119; R. 39, Judgment, PgID 130)

The government may point out that Mr. Jones has a "high risk" PATTERN score. But PATTERN scores are a problematic criterion for denying release. PATTERN is an algorithm created pursuant to the 1SA as a means for the BOP to determine an inmate's risk. But it "is still an incomplete tool [and] it has yet to be independently validated."[51] In fact, "many questions remain about PATTERN's validity because of possible racial/ethnic and gender bias and because of the tool's overemphasis on static factors such as criminal history." *Id.* For these reasons, numerous civil rights groups have urged the Attorney General to stop using PATTERN

---

[51] *See* Jerrold Nadler & Karen Bass, <u>Press Release, Subcommittee on Crime, Terrorism, and Homeland Security</u> (Mar. 30, 2020).

to assess who should be released during this pandemic.[52] Moreover, courts in this district have suggested any recidivism risk should be balanced along with considerations about the risk to defendant's health or conditions of release that can prevent recidivism.[53]

***Education & Rehabilitation.*** Mr. Jones has tried to participate in programming, but his disabilities have made completing programs difficult. The BOP has designated Mr. Jones as "non-promotable" on the GED, (Ex. J, Transcript), which indicates that he is ineligible to increase his pay grade in BOP work programs.[54] This should not be treated as a sign that Mr. Jones is not making efforts to improve himself, as this misunderstands his limited educational and academic skills.

The PSR gave only a sparse account of Mr. Jones's education, but what is there is enlightening. In the presentence interview, Mr. Jones said he "received special education services for both an unspecified learning disability and a behavioral disorder." (PSR ¶ 56.) His Test of Adult Basic Education, or TABE, results suggest that he has

---

[52] Letter to Attorney Gen. William Barr (Apr. 3, 2020), available at http://civilrightsdocs.info/pdf/policy/letters/2020/Final_Letter_on_PATTERN_in_Response_to_AG_Barr_Memo_on_4_26-4_3_2020.pdf.

[53] *See Hunt*, 2020 WL 2395222, at *7 (finding health risk and availability of conditions of release outweighed a high recidivism risk based on past convictions involving two armed robberies and drug trafficking crimes); *Harrell v. United States*, No. 13-20198, 2020 WL 2768883, at *4 (E.D. Mich. May 28, 2020) (finding 45-year-old's risk from hypertension and diabetes outweighed any benefit from serving the remaining half of his sentence).

[54] Dep't of Justice, *The Federal Bureau of Prisons Inmate Release Preparation and Transitional Reentry Programs: Finding and Recommendations*, available at https://oig.justice.gov/reports/BOP/a0416/findings.htm.

severely limited reading proficiency. (Ex. J, Transcript) Mr. Jones scored a 0.0 in

Reading on a TABE M test. (*Id.*). The scoring system operates as follows:

> [A] student can score a GE of 7.3 on a TABE Level M Mathematics
> Computation assessment. This indicates the student performs at Grade
> 7.3 on a test which covers content generally taught in fourth and fifth
> grade (the TABE M content grade level ranges from 4.0-5.9). One could
> expect the GE score to go down if the examinee is retested with Level D
> (where the content grade level ranges from 6.0 to 8.9) – because a student
> who can perform at the 7th grade level on 5th grade content can't perform
> at the same level on 7th grade content.[55]

| Test Level | Content Grade Level Range | Grade Equivalent Range |
|---|---|---|
| L | 0-1.9 | 0-4.9 |
| E | 2.0-3.9 | 0-6.9 |
| M | 4.0-5.9 | 0-9.9 |
| D | 6.0-8.9 | 0.7-12.9 |
| A | 9.0-12.9 | 1.1-12.9 |

Mr. Jones performed at the proficiency of a kindergartener doing fourth to fifth

grade-level coursework. This is why he has been unable to finish his GED coursework

so far. It would be a mistake to penalize him for his academic struggles.

Under current lockdown conditions, Mr. Jones will not gain any advantage from

BOP programming. To the extent he needs additional assistance or substance abuse

treatment, community-based substance abuse options in Tuscaloosa, Alabama, where

he plans to live if released, are better positioned to help at this time.

---

[55] PACE Learning Systems, Reviewing TABE Scores, https://pacelearning.com/revie
wing-tabe-scores/.

IV.      **Mr. Jones has a viable release plan.**

Mr. Jones has access to the tools and support systems he will need to re-enter the community. He will have access to means to support himself. Because he is an amputee, he received Social Security Disability payments in the past. *See* PSR ¶ 58. He will be eligible again to receive those payments upon release.

Mr. Jones also enjoys support from his family members. Undersigned counsel has been in communication with his sister in Alabama, who has offered to help Mr. Jones in any way she can. If released to home confinement, Mr. Jones plans to live in Alabama, where his sister, daughter, and three grandchildren live. Renee Jones and his daughter, Jessica Lewis, are willing to assist him with his transition and have offered a place for him to stay as he transitions to independent living. Ms. Jones has found an apartment where Mr. Jones could stay close to her: Grand View, 1700 Snows Mill Avenue, Northport, Alabama 35476. Mr. Jones can stay with his sister until the apartment is ready for him to move into, or with his daughter in Greensboro, Alabama.

**V. A 14-Day Quarantine in BOP Custody is Not Appropriate**

This Court should not subject Mr. Jones to a 14-day quarantine. Placement in "quarantine" does not protect inmates from contracting COVID-19 in prison, because they are still exposed to staff who circulate in and out of the quarantine location, as well as in and out of the prison and the community at large. District courts have properly concluded this "Kafkaesque" 14-day "quarantine" "is neither quarantine nor limited to

14 days."[56] Instead, quarantine involves housing with many other people "in conditions that will inevitably permit the virus to spread."[57] Mr. Jones can effectively self-quarantine at his sister's home.

## CONCLUSION

Anthony Jones respectfully requests compassionate release.

Date: August 24, 2020                    Respectfully Submitted,


**FEDERAL COMMUNITY DEFENDER**

s/ Colleen P. Fitzharris
Attorney for Anthony Jones
613 Abbott Street, Suite 500
Detroit, Michigan 48226
313-967-5868
E-mail: colleen_fitzharris@fd.org

---

[56] *United States v. Scparta*, 2020 WL 1910481, at *1 (S.D.N.Y. Apr. 20, 2020); *see also United States v. Resnick*, 2020 WL 1651508 (S.D.N.Y. Apr. 2, 2020) (rejecting 14-day quarantine in prison and because home confinement "will be significantly better than Devens FMC").

[57] *Scparta*, 2020 WL 1910481, at *1.

**CERTIFICATE OF SERVICE**

Counsel certifies that on the above date, the foregoing paper was filed with the clerk of the Court using the ECF system, which will send notification to opposing counsel.

Date:  August 24, 2020                    Respectfully Submitted,

**FEDERAL COMMUNITY DEFENDER**

s/ Colleen P. Fitzharris
Attorney for Anthony Jones
613 Abbott Street, Suite
Detroit, Michigan 48226
313-967-5868
E-mail: colleen_fitzharris@fd.org

23